# In the United States Court of Federal Claims

No. 21-788
Filed: January 18, 2023

| |
|---|
| **SCHNEIDER ELECTRIC BUILDINGS AMERICAS, INC.,**<br><br>                    *Plaintiff,*<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>                    *Defendant.* |

*Christopher V. Fenlon*, Hinckley, Allen & Snyder LLP, Albany, New York, for Plaintiff.

*Ebonie I. Branch*, Trial Attorney, *Steve Gillingham*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**TAPP, Judge.**

In contract cases, parties do not get what they deserve, only what they successfully negotiate. Plaintiff, Schneider Electric Buildings Americas, Inc. ("Schneider") contracted with defendant, the U.S. Department of Agriculture ("USDA" or "United States") for implementing Energy Conservation Measures ("ECMs") at USDA's Western Regional Research Center ("WRRC" or "the Research Center") to reduce energy consumption. USDA terminated the contract for default because it was dissatisfied with the performance of one subset of the energy-saving equipment installed by Schneider, steam-generating and hot-water generating boilers, and perceived Schneider's remediation plan unsuitable.

Schneider's Complaint alleges that the United States wrongfully terminated for default (count I), breached the contract by not carrying its duty to maintain the boilers (count II), by denying Schneider access to USDA's electric remote-access system that controlled and monitored the energy systems in the building (count III), by failing to compensate Schneider for the latent/differing site conditions (count IV), by failing to comply with its payment obligations under the contract (count V), and by breaching the covenant of good faith and fair dealing (count VI). (Compl. at 21–24, ECF No. 1). Schneider moves for summary judgment as to count I and partial summary judgment as to counts II, III, and V. (Pl.'s Mot. at 11, ECF No. 56).

Justified in its grievances or not, the United States embarked on an exit track that diverged from the contract's terms. Specifically, neither the United States' unilateral decision to withhold

progress payments nor its decision to view the secondary impact of Schneider's performance on the research at WRRC as an adequate basis for default termination is supported by the negotiated contract terms. As such, the default termination was improper.

## I.   Background

Under the National Energy Conservation Policy Act, federal agencies may contract for energy savings. 42 U.S.C. § 8287(c)(3). It is a requirement under such contracts that the contractor "incur costs of implementing energy savings measures," including the cost of "acquiring and installing equipment, and training personnel." 42 U.S.C. § 8287(a)(1). In exchange for incurring the upfront cost of installing energy saving measures, these contracts entitle the contractor to "a share of any energy savings directly resulting from implementation," of the energy savings measures at the site. *Id.*

Under the Energy Savings Performance Contract ("ESPC" or "the Contract") in this case, Schneider installed and commissioned $13 million in Energy Conservation Measures at the USDA Research Center located on the east shore of the San Francisco Bay in Albany, California. (Pl.'s Ex. 3 at 4). [1] The Contract also provided for incorporation of a new Building Automation System ("BAS") "to monitor and adjust setpoints, scheduling, alarms, and trending to reduce run hours on equipment and ensure a standard level of comfort." (Pl.'s Ex. 3 at 3). The Contract anticipated 23 years of performance, during which the energy savings would be shared; under this arrangement, Schneider would be paid $24,788,327 through annual installments (made up of the cost of ECMs installed, Schneider's financing cost, as well as payments for Schneider's post-installation performance). (Pl.'s Ex. 1 at 29). The Contract incorporated Schneider's May 2013 Final Proposal which stated that the contractual agreement was designed around three goals: (1) "Reduce manpower requirements for steam plant," (2) "Maximize energy reduction," and (3) "Address key facility needs." (Pl.'s Ex. 3 at 3; Pl.'s Ex. 4 at 5 (incorporating the Final Proposal)). The Contract also incorporated, relevant here, a Risk, Responsibility, and Performance Matrix ("RRPM" or "Responsibility Matrix") and an Operations, Maintenance, Repair, & Replacement Plan ("OMR&R" or "Maintenance Plan") that further detailed each party's duties and responsibilities. (Pl.'s Ex. 1 at 47–8).

One category of the ECMs installed by Schneider, the Boiler ECM, included two different types of boilers: steam-generating boilers called "Parker boilers" and hot-water-

---

[1] Citations to the record in this opinion are from the exhibits accompanying Plaintiff's motion for summary judgment, (Pl.'s Mot., ECF No. 56), referred to as "Pl.'s Ex. __" and the appendix accompanying Defendant's corrected response to motion for summary judgment, (Def.'s Resp., ECF No. 58), referred to as "Def.'s App. __" and docketed at ECF No. 59. When citing deposition transcripts, the page numbers refer to the page numbers of the original documents and not the page numbers generated by CM/ECF. When citing to the parties' briefs and other filings, including the parties' exhibits, the page numbers refer to the CM/ECF page numbers located in the heading of each page.

generating boilers called "Lochinvar boilers." (Pl.'s Ex. 3 at 172). This Boiler ECM accounted for approximately 22% of the total price of all ECMs. (Pl.'s Mot. at 39).

In May 2015, USDA certified that Schneider had completed the construction phase of the Contract and fully accepted the Boiler ECM in October 2015 after Schneider supplemented some of its work on the Boiler ECM. (Pl.'s Ex. 9, 15). Under the Contract, USDA's payment obligations commenced after full acceptance of the equipment installed by Schneider. (Pl.'s Ex. 1 at 29).

The parties' dispute germinated from mechanical issues with the Boiler ECM. (Def.'s Resp. at 8). Both types of boilers required "blowdowns" to remove sediment and impurities from the water and chemical treatment of their feedwater. (Pl.'s Ex. 8 at 6, 14). Water impurities impacted the Boiler ECM performance, causing scaling, corrosion and ultimately the emergence of "pinhole leaks in the tube bundles." (Pl.'s Ex. 50 (WRRC's Center Director, Tara McHugh's ("McHugh") Deposition ("Dep.")) 40:13–42:5; Ex. 48 (USDA Quality Assurance Specialist, Christopher Mehelis' ("Mehelis") Dep.) 89:16–90:9). Schneider subsequently installed automatic top blowdowns on the boilers, while certain boilers continued to rely on manual labor for bottom blowdowns. (Pl.'s Ex. 17, 18, 48 (Mehelis Dep.) 90:10-16). USDA asserts that the boilers "failed routinely and were never repaired to the point where they operated reliably." (Def.'s App. at 193 (McHugh Dep.) 61:10–13; *see also* Def.'s Resp. at 8 (detailing frequency of boiler failures)). Additionally, in and around early 2019, USDA terminated Schneider's access to BAS, later citing IT concerns. (Def.'s Resp. at 39).

USDA did not pay the Year 5 invoice issued by Schneider, due January 1, 2019; it instead remitted a late partial payment on April 16, 2019.[2] (Def.'s Resp. at 35). Schneider claims that in June 2019, it had submitted a plan to repair the Lochinvar boilers in response to an earlier request by USDA from May 2019. (Pl.'s Mot. at 26). Despite this plan, on July 11, 2019, USDA sent Schneider a cure notice ("the Cure Notice") requesting a plan of action and timeline for addressing "Lochinvar boiler operational consistency," notifying Schneider that USDA believed those issues to be "endangering the overall performance of the contract." (Pl.'s Ex. 24).

During a July 2019 meeting, the USDA officials discussed the possibility of terminating the Contract. (Pl.'s Ex. 49 (Contract Specialist, Robert Risch's ("Risch") Dep.) 123:9–124:16; Pl.'s Ex. 25). On January 1, 2020, USDA once again did not pay the Year 6 invoice from Schneider in full, instead remitting a late partial payment on August 11, 2020, over eight months overdue. (Def.'s Resp. at 35).[3] In January 2020, Schneider submitted a Claim under Federal Acquisition Regulations ("FAR") 52.233-1 seeking the remaining balance of its Year 5 and the entirety of its Year 6 payment, plus interest, (Pl.'s Ex. 32), and in November 2020, for the costs associated with the USDA's cancelation of and refusal to restore access to the BAS. (Pl.'s Ex. 45).

---

[2] USDA's late payment of $334,576.06 was $550,314.03 short of the amount requested in the invoice. (Pl.'s Ex. 3, 21).

[3] USDA's late payment of $652,298.40 was $255,456.50 short of the amount requested in the invoice. (Pl.'s Ex. 29, 30, 43).

On February 7, 2020, dissatisfied with Schneider's response to the Cure Notice, USDA sent Schneider a show cause letter asking for a plan of action to repair the problems "with the Lochinvar as well as the Parker boilers," and notifying Schneider that USDA was "considering terminating the contract under the provisions for default of this contract." (Pl.'s Ex. 33) Schneider did not immediately respond to the show cause letter because the only recipient of the notice was out on maternity leave. (Pl.'s Ex. 47 (USDA Contracting Officer, Deborah Hughes ("Hughes") Dep.) 171:15–21; Pl.'s Ex. 49 (Risch Dep.) 143:25–144:8). On March 17, 2020, USDA issued a "Nonresponse to Cure Notice/Show Cause Notice" that informed Schneider that it was proceeding with termination for default. (Pl.'s Ex. 34). This letter stated that "ongoing reported failures of both the Parker and Lochinvar boilers," were negatively impacting "the missions of the USDA PWA WRRC units as well as other USDA Agency Units . . . causing continued harm and loss to the government." (*Id.*). Schneider's response to this letter explaining why it failed to respond to the show cause letter and attempting to address USDA's concerns did not elicit a response from USDA. (Pl.'s Ex. 49 (Risch Dep.) 150:6–22). Schneider continued to respond to USDA's service calls. (*Id.* at 157:12–23; Pl.'s Ex. 46).

On April 23, 2020, USDA transmitted a Request for Review of Termination for Default to the Contract Review Board ("CRB"). (Pl.'s Ex. 36). On July 5, 2020, USDA drafted a Memorandum of Record ("MOR" or "July Memo") that memorialized the reasons for termination and included discussion of seven factors listed at FAR 49.402-3(f) ("FAR factors"). (Pl.'s Ex. 41).

Finally, on July 30, 2020, USDA terminated the contract for default under FAR 52.249-8. (Pl.'s Ex. 42). The termination letter lists "continued interruption of services daily from single/multiple boilers" and Schneider's "insufficient" response to it as cause for termination, stating that this "was endangering the overall performance of the contract." (Pl.'s Ex. 42); *see also* FAR 52.249-8(a)(1)(ii) (providing that the United States may terminate for default if the contractor fails to "[m]ake progress, so as to endanger performance of . . . contract").

Schneider argues that the default termination was improper (claim I) because the Contracting Officer ("CO") did not consider the FAR factors, abdicated responsibility in considering termination, and because USDA's cure notice was insufficient. (Pl.'s Mot. at 33–44). Schneider also argues that the United States breached the contract by: (1) unilaterally withholding progress payments in contravention of the contractual payment schedule (count V), (2) failing to comply with its contractual operations and maintenance obligations which impeded the performance (count II), and (3) canceling Schneider's remote access to the Research Center's Building Automation System which would have allowed Schneider to monitor and troubleshoot equipment performance (count III). (Pl.'s Mot. 44–48).

## II.    Analysis

The United States may terminate contracts for default based on the contractor's actual or anticipated failure to perform its contractual obligations. FAR 2.10, 49.401(a). Despite its deep roots in public procurement, default termination is still commonly recognized as a "harsh," "drastic," and "disfavored" remedy. *Pinckney v. United States*, 88 Fed. Cl. 490, 505 (2009); *Composite Laminates v. United States*, 27 Fed. Cl. 310, 325 (1992). Therefore, the United States

4

bears a "heavy burden" to establish default termination was justified. *Composite*, 27 Fed. Cl at 326; *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). Because courts recognize federal agencies' need to rely on default termination to discharge deficient contractors, default terminations can be upheld even based on post-hoc reasons, so long as they clearly reflect the contractor's deficiencies. *Joseph Morton Co. v. United States*, 757 F.2d 1273, 1277 (Fed. Cir. 1985) (finding that it is "settled law that a party can justify a termination if there existed at the time an adequate cause [for termination], even if then unknown.") (citing *Pots Unlimited, Ltd. v. United States*, 600 F.2d 790, 793 (Ct. Cl. 1979)). But in every case, default termination will only be sustained if it is based on "good grounds and on solid evidence." *J. D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969).

Even where a contracting officer's legal opinion and findings of fact are fully explained, such explanations are not binding on the United States before the Court, as the Court's review is de novo. *Cherokee Gen. Corp. v. United States*, 150 Fed. Cl. 270, 283 (2020); 41 U.S.C. § 7103(e). Whether the United States is justified in exercising its contractual right to terminate for default involves a question of law based on factual underpinnings. *McDonnell Douglas Corp. v. United States*, 567 F.3d 1340, 1347 (Fed. Cir. 2009), *vacated on other grounds by Gen. Dynamics Corp. v. United States*, 563 U.S. 478 (2011); *Pinckney*, 88 Fed. Cl. at 505 ("The decision of the contracting officer to terminate a contractor for default is reviewed de novo by the Court of Federal Claims."). In a specific subset of cases where the contractor alleges that there was no "nexus between the default termination and the contractor's performance," or that the contracting officer's decision was "rendered in bad faith," the Court may set aside the termination as arbitrary, capricious or an abuse of discretion. *See Darwin Constr. Co. v. United States*, 811 F.2d 593, 598 (Fed. Cir. 1987)); *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1329 (Fed. Cir. 1999) (citing *U.S. Fidelity & Guaranty Co. v. United States*, 676 F.2d 622, 630 (Ct. Cl. 1982)). In such cases, the Court's determination is shaped by four factors: (1) evidence of subjective bad faith on the part of the government official, (2) whether there is a reasonable, contract-related basis for the official's decision, (3) the amount of discretion given to the official, and (4) whether the official violated an applicable statute or regulation. *McDonnell Douglas Corp*, 182 F.3d at 1326. If the contractor can show that the default termination was unjustified, the standard remedy is a conversation of the improper default termination to a termination "for the convenience of the Government." FAR 52.249-8(g).

The moving party is entitled to judgment as a matter of law when "there is no genuine issue as to any material fact." *Composite*, 27 Fed. Cl. at 314. In considering a motion for summary judgment, the Court will eschew weighing the evidence and instead will determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). An issue is "genuine" if it "may reasonably be resolved in favor of either party." *Id*. at 250. Contract interpretation involves questions of law and is therefore "generally amenable to summary judgment." *Premier Office Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (citation omitted).

A. *Improper Default Termination*

The Contract incorporated the default clauses for Fixed-Price Supply and Services and Fixed-Price Construction Contracts, FAR 52.249-8 and 52.249.10, by reference. (Pl.'s Ex. 1 at 52). FAR 52.249-8(a)(1) requires the contracting officer to provide a written notice to the contractor informing them of the intention to terminate for default, if the contractor fails to either: (1) "[d]eliver the supplies or to perform the services within the time specified" in the contract or any extension; (2) "[m]ake progress, so as to endanger performance" of the contract or (3) perform any of the other provisions of the contract. *Id.* If the contractor does not cure such failure within 10 days after receipt of the written notice from the contracting officer specifying the failure, the contracting officer can terminate for default. FAR 52.249-8(a)(2). These legal requirements provide the background for the Court's review of Schneider's claims that default termination was improper—namely, whether USDA's consideration of FAR factors was inadequate, whether the CO abdicated her responsibilities in conducting the termination analysis or by relying on "outdated, irrelevant, and inaccurate Information," and whether the USDA's notice was insufficient. (Pl.'s Mot. at 33–36).

i. Failure to consider FAR 49.402-3 factors

FAR 49.402-3(f) states that "[t]he contracting officer shall consider," seven listed factors in determining whether to terminate a contract for default. These factors are: (1) the terms of the contract and applicable laws and regulations; (2) the failure of the contractor and any excuses for such failure; (3) the availability of supplies or services from other sources; (4) the urgency of the need for the supplies or services and the period of time required to obtain them from alternative sources after default termination; (5) the degree of essentiality of the contractor in the acquisition program and the impact of termination on the contractor's capability as a supplier under other contracts; (6) the effect of default termination on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments; and (7) any other pertinent facts and circumstances. *Id.* Schneider argues that this provision dictates an "unambiguous requirement," and that strict review of each factor must precede every termination decision. (Pl.'s Mot. at 56).

Schneider points to what it believes to be critical events in USDA's consideration of default termination (such as the July 2019 internal presentation to USDA senior management or the April 2020 request to the CRB) and emphasizes that extensive discussion or evaluation of any of the FAR 49.402-3 factors is conspicuously absent. (Pl.'s Mot. at 34; Pl.'s Ex. 25). The parties agree that the only evidence in the record showing consideration of the seven FAR factors appears in the July Memo analysis. (Def.'s Resp. at 10; Pl.'s Ex. 49 (Risch Dep.) 151:21–23; Pl.'s Ex. 41).

Schneider is incorrect that failure to follow FAR 49.402-3(f) grants the contractor basis for overturning the default determination. This much is clear from *DCX, Inc. v. Perry*, which states that FAR 49.402-3(f), whatever its scope or application, does "not confer rights on a defaulting contractor." 79 F.3d 132, 135 (Fed. Cir. 1996). After all, the Court has long recognized that a default termination may be justified even upon alternative grounds that were not identified by the contracting officer at all, and in cases where the contracting officer's own

"analysis necessary to sustain," such alternative theory does not exist in the record. *Empire Energy Mgmt. Sys. v. Roche*, 362 F.3d 1343, 1357 (Fed. Cir. 2004). [4]

Schneider frames the absence of evidence that the CO independently considered the seven FAR factors, evidence of the CO's lack of technical familiarity with the project, and the contract specialist's lack of personal familiarity with the Research Center, as additional grounds for invalidating the termination decision. (Pl.'s Mot. at 29, 41–42). Schneider maintains that, together, these procedural errors establish that the CO failed to independently assess the merits of the termination decision, resulting in an "abdication of responsibility." (*Id*. at 36–41). Schneider's contentions stretch the boundaries of what the Court has historically viewed as "abdication of responsibility."

The requirement for the contracting officer to exercise "personal and independent judgment," is not an "implied prohibition against . . . first obtaining or even agreeing with the views of others." *Pac. Architects & Eng'rs, Inc. v. United States*, 491 F.2d 734, 744 (Ct. Cl. 1974); *see also North Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 209 (2007). The Court's focus is therefore not on assessing whether the CO had first-hand knowledge of every detail in the final opinion; instead, the key inquiry is whether the CO can "take ownership of all determinations included in the final . . . opinion," *CEMS, Inc. v. United States*, 65 Fed. Cl. 473, 479 (2005). For example, when the contracting officer is directed by a superior officer to decide the dispute in a certain way without regard to the evidence before him, the Court has found that to constitute an abdication of responsibility. *See e.g.*, *Johnson Contracting Co. v. United States*, 132 F. Supp. 698 (Ct. Cl. 1955). This case does not present an instance in which the CO's decision was detached from the merits of the case as the USDA officers understood them. Nor is there any evidence of outside pressure, such as superiors or other officers strongarming the CO into making a final determination contrary to her own findings. *See e.g.*, *Schlesinger v. United States*, 390 F.2d 702 (Ct. Cl. 1968); *John Reiner & Co. v. United States*, 325 F.2d 438, 442 (Ct. Cl. 1963).

The Court has routinely reiterated that a contracting officer may properly rely on and adopt as their own the advice of technical personnel without sacrificing independent judgment. *See e.g.*, *RDA Constr. Corp. v. United States*, 132 Fed. Cl. 732, 788–89 (2017) (rejecting the argument that CO's lack of knowledge about the construction issues reflected "clear lack of independence"). Schneider has not pointed to evidence of dishonesty, bad faith, or hostility that would call into question the CO's reliance on the information provided by the USDA officials.

---

[4] After full briefing and oral argument, both parties agree that the FAR 49.402-3(f) factors are not the "end-all of the analysis," and instead present guidelines that "the Court should take into consideration." (July 11, 2022, Oral Argument Transcript ("OA Tr.") 20:15–21:11, ECF No. 52). Furthermore, focusing on the alleged flaws in the procedures followed by the CO through the arbitrary and capriciousness lens—as Schneider does—misconstrues the Court's standard of review for such cases. *Cherokee Gen. Corp.*, 150 Fed. Cl. at 279 (noting that "[t]he Court of Federal Claims does not use an Administrative Procedure Act style standard of review in cases that arise under the Contract Disputes Act (CDA)"). Instead of focusing on how the agency reached or recorded its findings and determinations, the Court makes its own findings and determinations under a de novo standard. *See* 41 U.S.C. § 7104(b)(4).

*See e.g.*, *Alutiiq Mfg. Contrs., LLC v. United States*, 143 Fed. Cl. 689, 698 (2019) (finding that evidence of "hostility" towards the contractor or "history of dishonesty" can undermine the contracting officer's reasoning). Indeed, the FAR recognizes the importance of contracting officers' collaboration with other experts in reaching contract decisions, noting that contracting officers should "request and consider the advice of specialists in audit, law, engineering, information security, transportation, and other fields, as appropriate," 48 C.F.R. §§ 1.602-2(c), 33.211. *CEMS, Inc.*, 65 Fed. Cl. at 479 ("This court . . . once again does not[] find that the traditional use of a contracting officer's technical representative in the administration of large contracts, with many separate tasks, necessarily constitutes an abdication of responsibilities.").

Schneider commits a considerable amount of its motion to describing how each FAR 49.402-3(f) factor was misapplied. (Pl.'s Mot. 29–32, 41–42). As the Court finds that not every departure from FAR 49.402-3(f) automatically entitles the contractor to conversion of a default termination, it forgoes a line-item review of each single argument presented. Nonetheless, when the CO's reasoning is evaluated with particular attention to the FAR 49.402-3(f) factors, a critical flaw in the CO's reasoning emerges.

FAR 49.402-3(f)(1) states that the contracting officer shall consider "the terms of the contract and applicable laws and regulations" in making the termination decision. FAR 52.249-8 is an example of an applicable regulation that the CO relied on; particularly, the CO found that Schneider had failed to "[m]ake progress, so as to endanger performance of this contract," meeting the requirements of 52.249-8(a)(1)(II). (Pl.'s Ex. 42 (termination letter citing Schneider's "inability to provide a schedule to evaluate the problems with . . . boiler operational consistency [as] a condition that is endangering the overall performance of the contract"). Although a variety of issues can endanger the performance of a contract so as to justify termination, such as failure to meet performance milestones, *see e.g.*, *Armour of Am. v. United States*, 96 Fed. Cl. 726, 745–46 (2011), ongoing problems with subcontractors and suppliers, *see e.g., Artisan Electronics Corp. v. United States*, 205 Ct. Cl. 126 (1974), or the contractor's financial difficulties, *see e.g., Danzig v. AEC Corp.*, 224 F.3d 1333 (2000), in every instance the underlying performance requirement must be rooted in and articulated in the clear terms of the contract. *See Armour of Am.*, 96 Fed. Cl. at 745–46 (2010); *see also, Mktg. & Mgmt. Info., Inc. v. United States*, 57 Fed. Cl. 665, 674 (2003) ("The parties' respective rights and responsibilities would normally be found only within the four corners of the contract.").

Here, USDA found that Schneider's failure to progress was endangering performance, <u>not</u> because Boiler ECM failures were impacting the energy-savings guarantees under the Contract, but because they were "hinder[ing] USDA's research efforts." (Def.'s Resp. at 8). The July Memo likewise highlights the boiler failures' impact on "the ability of the units at the location to progress and/or complete their missions in a timely manner with . . . potential of causing harm to the general food supply as one of the missions is food safety inspection." (Pl.'s Ex. 41). Ms. Hughes elaborated on what USDA viewed as endangering the performance of the contract: "there's various research labs at WRRC, so if water temperatures are not correct, or are not working at all for the scientists to complete their researches . . . it affects the outcome of the research results." (Def.'s App. at 161 (Hughes Dep.) 247:13–22). The United States' response to the motion for summary judgment reiterates the same reasoning, claiming that "Schneider's interruption of USDA's research endeavors . . . is undoubtedly a violation of the contract terms." (Def.'s Resp. at 18). Yet neither the CO then, nor the United States now, have identified the

8

contract terms that would entitle the United States to view interference with USDA's research as a critical failure in performance. Instead, as the contract states, the parties' agreement was designed around the following performance "goals:" (1) "reduc[ing] manpower requirements for steam plant," (2) "[m]aximiz[ing] energy reduction," and (3) "[a]ddress[ing] key facility needs," by "upgrad[ing] key pieces of equipment." (Pl.'s Ex. 3 at 3). The United States has not argued, let alone establish, that Schneider did not deliver the energy reduction guarantees or failed in the delivery of upgraded equipment. (Ex. 42). When pressed at oral argument on the glaring absence of any reference to contract terms that would specify stability of USDA's research endeavors as a separate and important goal, the United States averred that there are not "any such specifications in the contract." (OA Tr. 13:4–23, *see also* 14:8–16 ("But to answer your question directly, I'm not aware of any specific specification that says, you know, the project will maintain this water temperature or pressure or whatever the case may be.").

Faced with this incongruency, the United States urges the Court to look beyond the four corners of the contract and to the broader intent behind the Contract. (OA Tr. 27:12–29:18). Yet, as the Federal Circuit has noted, a reasonable basis for termination must be both "contract-related" and maintain a close nexus to a "clear violation of contract terms." *Keeter Trading Co. v. United States*, 79 Fed. Cl. 243, 253 (2007) (citing *McDonnell Douglas*, 182 F.3d at 1328); *see also Lanterman v. United States*, 75 Fed. Cl. 731, 734 (2007) ("One of the relevant factors in determining whether a contractor is in default is the contractor's failure to meet contract specifications."). Courts are ill-suited to divine other, unexpressed intentions, of contracting parties when the written agreement specifically details contract goals. Contract negotiations must begin with the end in mind. Despite the United States' insistence that interference with USDA's research presented an issue of paramount importance, the United States' failure to trace that priority to the text of the contract is pivotal. *Uniloc 2017 LLC v. Google LLC*, 52 F.4th 1352, 1356 (Fed. Cir. 2022) ("[W]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract . . . .") (citing *Tomhannock, LLC v. Roustabout Res., LLC*, 128 N.E.3d 674, 675 (N.Y. 2019)). The United States bears the burden of showing that resorting to the drastic option of terminating for default was justified. *Lisbon Contractors*, 828 F.2d at 765. The United States has not shown that the Contract expressly allowed the United States to use any secondary impact on USDA's research as a quality control measure for Schneider's performance, even when Schneider has met its energy-savings goals. It is not the Court's position to "simply rewrite the contract to achieve an end the defendant finds to be more desirable." *Coplin v. United States*, 6 Cl. Ct. 115, 127 (1984) (citing *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943)).

The CO approved the default termination despite substantial compliance with the specific goals of the contract, and when the deficiencies did not directly relate to the stated "terms of the contract." FAR 49.402-3(f)(1); 2 Federal Contract Management ¶ 13.04 ("Because it can be exercised only for cause, default termination, unlike termination for convenience, must always be justified by the contract's terms."). As a result, termination for default was improper, and Schneider is entitled to judgment as a matter of law on its wrongful termination claim.

ii.   Insufficient Notice

Schneider also asserts that the termination decision violated FAR 52.249-8, as it was at least partly based on reasons not specified in the written cure notice. (Pl.'s Mot. at 42).

Specifically, Schneider draws attention to several issues discussed in the July Memo that Schneider never received specific notice of or an opportunity to cure; these items involve distinct technical issues with the boilers such as "incorrect pressure rating," or "the lack of earthquake bracing." (*Id.*). Schneider's argument is unavailing. As the Court has previously stated, cure notice is adequate when "it [is] apparent from the circumstances that the contractor 'had sufficient notice of the asserted defects.'" *Empire Energy*, 362 F.3d at 1356 (citing *Halifax Eng'g, Inc. v. United States*, 915 F.2d 689 (Fed. Cir. 1990)).

In fact, as long as the contractor previously received "a formal, written cure notice *directed to a related concern*," default termination can be permissible even without a formal cure notice that specifies each particular failure because in such cases "actual notice of the nature of the government's concerns" exists. *Empire Energy*, 362 F.3d at 1356 (emphasis added); *see also Am. Marine Upholstery Co. v. United States*, 345 F.2d 577, 581 (Ct. Cl. 1965). In reviewing the efficiency of the notice, the Court's focus is to gather whether it was apparent from the circumstances that the contractor "had sufficient notice of the asserted defects." *Halifax Eng'g, Inc.*, 915 F.2d at 689.

The record indicates that Schneider had actual notice of the asserted defects. The Cure Notice referenced Schneider's "inability to provide a schedule to evaluate the problems . . . with boiler operational consistency," and requested a plan of action for "correction of all discovered problems that [were] causing the continuous," shutdowns. (Pl.'s Ex. 24). This language is indicative of the parties' past communications about the boiler issues, and in fact, the record reflects that Schneider, by this point, had enough constructive notice of the scope of issues to submit a plan of action to address them. (Pl.'s Ex. 54 (Schneider's former contracting team lead, Rachelle Baines's ("Baines") Dep.) 151:24–152:3); Pl.'s Mot. at 26 (stating that Schneider had already provided a plan of action to resolve the Lochinvar boilers by that date and claiming that the plan was sufficient to address USDA's ongoing issues)). The United States also points to evidence in the record, including meeting minutes and emails between parties that paint a picture of extensive communications between the parties about the ongoing technical problems before the Cure Notice was issued. (Def.'s Resp. at 21, 23; *see also* Pl.'s Mot. at 26 (stating that "[f]ollowing the issuance of the Cure Notice, meetings were held on nearly a bi-weekly basis to discuss Schneider's plans for addressing the USDA's concerns")). The circumstances of the parties' year-long communication about the defects imply that Schneider could have had actual notice of the exact nature of the USDA's concerns. Therefore, Schneider has not established that it is entitled to judgment as a matter of law because USDA failed to provide it with sufficient notice of the reasons for termination. *See Int'l Verbatim Reporters, Inc. v. United States*, 9 Cl. Ct. 710, 721 (1986) (noting that a cure notice need "not cite each and every failure," as long as it lists "with enough particularity the performance failures which have placed the contractor in danger of termination for default.").

### B.  United States' Breach of Contract

If a contractor can establish that the United States materially breached the contract, the contractor's failure to perform may be excused and a termination for default converted to a termination for convenience. *Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1276 (Fed. Cir. 1999). Not every departure from the literal terms of a contract, however, amounts to a material breach. *Morganti Nat'l v. United States*, 49 Fed. Cl. 110, 140 (2001). Whether a

particular breach is material "depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties." *Stone Forest Indus., Inc. v. United States*, 973 F.2d 1548, 1551 (1992). Schneider maintains that the United States breached the contract in at least three ways before the default termination decision: first, by improperly withholding payments; second, by failing to maintain the boilers; and third, by denying Schneider access to the BAS. (Pl.'s Mot at 44–48). To prevail Schneider must show that each action constitutes a breach of the contract and the materiality of the breach.

> i.   Failure to make payments

The Contract incorporated FAR 52-232-1 which mandated that "[t]he Government shall pay the Contractor, upon the submission of proper invoices." FAR 52.232-25, also incorporated in the Contract, provides that the United States shall issue prompt payment no later than "the "30th day after the designated billing office receives a proper invoice from the Contractor." Despite this language, it is uncontroverted that USDA did not timely remit the Year 5 and Year 6 payments after receiving an invoice from Schneider. (Pl.'s Ex. 19, 29; Def.'s Resp. at 35).

The United States has not identified any authority in the Contract authorizing the United States to unilaterally withhold payments. Neither do any regulations permit the United States to withhold payment installation on the basis that grounds for default termination may exist. *See Johnson v. All-State Constr., Inc*. 329 F.3d 848, 852 (Fed. Cir. 2003). Any exceptions to the United States' obligation to make progress payments must be justified by referencing the Contract's express term. *Florida Engineered Constr. Prods. Corp. v. United States*, 41 Fed. Cl. 534, 539 (1998) ("Where the contract does not obligate the government to make progress payments, however, plaintiff cannot allege a breach because the government withheld progress payments."). In this case, the contract provisions mandating the United States to make prompt payments only allow the United States to adjust the payment amount listed in an invoice "if the contractor fails to meet the guaranteed annual savings . . . ." (Pl.'s Ex. 1 at 33, § G.4., 5), referred to in the Contract as the Measurement and Verification ("M&V") process. Although this process would notify Schneider of the basis for withholding payments, the United States never followed this procedure and never provided Schneider with an explanation as to why it was withholding payments:

> COURT: Can I discern from the record that's been submitted, the exhibits and everything, that [United States' reason for withholding payments] was communicated to Schneider, and, if so, when was it communicated?

> DEFENDANT'S COUNSEL: In fairness, I don't believe that the Court can discern that from the record[.]

(OA Tr. 44:25–45:5).

Even though the United States now attempts to explain why the annual payments were withheld—to offset the cost of any remaining boiler tenders' salaries—this post-hoc explanation is untethered from the text of the Contract:

> COURT: Where in the contract can I find the authority for the United States to withhold those sums?

11

> DEFENDANT'S COUNSEL: . . . I distinctly remember having this conversation with agency counsel. So I do believe there's a cite. I don't have it right now in front of me but I am happy to provide it to the Court . . . .

(OA Tr. 42:1–15).[5]

Both USDA witnesses and the contract specialist have testified that the United States withheld portions of payments to account for cost-savings that the United States believed had not materialized. (Pl.'s Mot. at 20–21; *see also* OA Tr. 44:20–24 (United States' Counsel asserting that payments were withheld because "there were so many frequent boiler failures that necessitated additional boiler tender time above and beyond what the agency anticipated . . . .")). Schneider retorts that even this post-hoc explanation is contradicted by the terms of the Contract which clearly anticipate reliance on some boiler tenders. (Pl.'s Mot at 20–21).

The United States' contention that it was entitled to cost-savings that would materialize from the complete elimination of all boiler tenders involves interpretation of the Contract's terms and therefore presents a question of law.[6] *CW Gov't Travel, Inc. v. United States*, 63 Fed. Cl. 369, 390 (2004) ("Interpretation of the clear and unambiguous language of a contract is a question of law that may be resolved by summary judgment."). In resolving disputes involving contract interpretation the Court first examines the plain language of the contract. *M.A. Mortenson Co. v. Brownlee*, 363 F.3d 1203, 1206 (Fed. Cir. 2004). The United States' position is untenable given the text of the contract and contemporary evidence reflecting the parties' understanding.

The Contract stated that Schneider's plan "will enable the WRRC *to reduce* the number of boiler attendants, resulting in annual savings of $443,643." (Pl.'s Ex. 3 at 3) (emphasis added). The United States has maintained that this language anticipates elimination of boiler tenders. (Pl.'s Ex. 41 at 1 (July Memo noting that "[p]art of cost savings to location was lack of the requirement for boiler tenders which was never accomplished.")). The United States' position cannot be reconciled with the plain and ordinary meaning of the term "to reduce." *Alliant Techsystems, Inc. v. United States*, 74 Fed. Cl. 566, 576–7 (2007) ("[W]here the language of the contract is clear and unambiguous 'the words of those provisions must be given their plain and ordinary meaning by the court in defining the rights and obligations of the parties.'") (citing *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 579 (Fed. Cir. 1987)).

To reduce does not mean to eliminate or abolish. To reduce is to "diminish in size, amount, extent or number." Merriam-Webster's Collegiate Dictionary at 1044 (11th ed. 2009). Therefore, the Contract anticipated that Schneider would decrease, or perhaps minimize, the

---

[5] Although United States was given the opportunity to supplement its response before the conclusion of oral argument, it did not then, and it has not yet. (OA Tr. 53:16–22).

[6] The United States does not cite to the text of the contract to support its argument that the Contract viewed boiler tender cost-reduction as a part of energy-saving; instead it chiefly relies on witness depositions as support. (*See* Def.'s Resp. at 7 (citing to Ms. Baines's deposition)).

number of boiler attenders, as opposed to eliminating that responsibility altogether. *See CUNA Mut. Life Ins. Co. v. United States*, 169 F.3d 737, 743 (Fed Cir. 1999) (finding that the word "reduced" is "a common, unambiguous, non-technical term" which means to diminish in size or amount); *Saginaw Office Serv. V.. Bank of Am., N.A.*, 2011 U.S. Dist. LEXIS 34340 at *11 (E.D. Mich. Mar. 30, 2011) (finding that definition of reduction does not "unambiguously embody an expansive scope that views complete deletion as a subset of diminution."); *Appeal of Catel, Inc.*, ASBCA No. 52224, 2002 ASBCA LEXIS 4, 2002-1 BCA ¶ 31,731 at 156,763 (finding "that the word "reduction" cannot be interpreted so as to convey an intent to delete the disputed items."). The United States has not bolstered its argument with any other evidence that would contradict this ordinary meaning or imply that by using the term "reduce" the parties stated an objective to reduce to zero or eliminate boiler tender requirements.

Even if this language was ambiguous, the parties' course of dealing and contemporaneous circumstances do not support United States' position. *See Pub. Serv. Co. of Okla. v. United States*, 88 Fed. Cl. 250, 258 (2009) ("Course of performance can become instructive when the contract terms are ambiguous."). The record reflects that internal presentations prepared by the USDA staff stated that the Boiler ECM "[a]llowed center to reduce 24 hour boiler tender to 8 hr., 5 days a week boiler tender . . . .") (Pl.'s Ex. 16 at 15). In emails discussing the need to install automatic blowdowns for the boilers, USDA staff stated that "Schneider was aware at the outset of the [contract] that [post-contract] boiler tender presence would no longer be 24/7 but rather M-f, ~8 hours/day." (Pl.'s Ex. 18 at 2). Schneider provided the USDA with manuals that described the responsibilities for operations of the boilers; these manuals stated that the boilers required blowdowns that "should be made in the middle or the start of each shift," guidance that would contradict an understanding among the parties that the contract anticipated elimination of boiler tender shifts. (Pl.'s Ex. 8 at 6); *Jansen v. United States*, 344 F.2d 363, 369 (Ct. Cl. 1965) ("It is a canon of construction that the interpretation placed by the parties upon a contract during its performance is demonstrative of their intention."). Therefore, the Court finds that the United States' decision to unilaterally withhold payments to offset the cost of compensating boiler tenders constituted a breach of contract because the Contract did not anticipate elimination of boiler tenders.

The United States' breach in unilaterally withholding significant portions of two progress payments is also material. The Court has recognized that a "prolonged failure to pay large amounts" constitutes a material breach. *Northern Helex Co. v. United States*, 455 F.2d 546, 550 (Ct. Cl. 1972) (finding that the Court of Claims' jurisprudence "strongly suggests" that "a total failure to pay over many months" by the Government is "material, just as it would be in the case of a private party."). Because this material breach preceded United States' termination for default, it provides a separate ground for converting the default termination to a termination for convenience. *Morganti Nat'l*, 49 Fed. Cl. at 140 ("[A] termination for default [is] converted to a termination for the convenience of the government if the contractor can establish that the government materially breached the contract.").

ii.  Failure to Maintain Boilers

Schneider also claims that the United States breached the Contract by failing to perform its boiler maintenance obligations under the Contract, causing a "critical failure," to the Parker boilers. (Pl.'s Mot. at 46). Prior to the Contract, the existing boiler system at the Research Center

required boiler tenders to be physically on-site 24 hours a day, seven days a week. (Pl.'s Ex. 52 at 3). As stated, although the parties share the understanding that the Contract was designed to move this task towards automation, they disagree as to whether the Contract required Schneider to eliminate the need for physical maintenance by boiler tenders. Both parties agree that boiler feed water impurities and failure to conduct blowdowns with sufficient frequency contributed to the critical failure. (Pl.'s Mot. at 19; Def.'s Resp. at 37).

Schneider argues that the Contract unambiguously assigned the task of regularly maintaining the boilers to the United States. (Pl.'s Mot at 46). To support this assertion, Schneider points to the Responsibility Matrix, incorporated in the contract, which states that "[i]t is the responsibility of the government to ensure that all ECMs are used properly and in accordance with the Key Operating Strategies contained [in] each [sic] ECM's Design Intent Document and/or Basis of Design in the IGA." (Pl.'s Mot. at 14–16; Ex. 3 at 168). Schneider also relies on the Maintenance Plan which includes a responsibility breakdown for maintenance of the boilers; this breakdown outlines Schneider's boiler maintenance obligations as conducting "Quarterly and Annual activities only." (Pl.'s Ex. 3 at 15). Moreover, the warranty plan clause of the contract also alludes to USDA's maintenance responsibilities by stating that Schneider's warranty plan excludes remedy for any damage caused by "improper or insufficient maintenance of equipment and systems for which the Government is responsible for preventive maintenance," or "improper operation of equipment and systems for which the Government is responsible for operations . . . ." (Pl.'s Ex. 3 at 172). Beyond the text of the agreement, Schneider also provides evidence reflecting the parties' understanding of the same division of tasks; for example, minutes from a December 13, 2013, meeting between Schneider and USDA states: "Preventative maintenance for boilers to be provide[d] by [Schneider's] team on a quarterly and annual basis," and that "[d]ay-to-day operation of boilers will remain responsibility of the USDA/Center." (Pl.'s Ex. 7 at 3).

The United States differs. Its response does not address the import of the contractual text relied on by Schneider which suggests that routine maintenance of the boilers was USDA's responsibility; neither does the United States dispute that USDA failed to conduct such routine maintenance tasks such as treating the feedwater or conducting bottom blowdowns. Instead, the United States responds that there is a genuine issue of material fact as to what caused the boiler failures. (Def.'s Resp. at 36–8). Relying solely on witness testimony, including that of the Director of the Research Center, and without reference to specific text of the contract, the United States claims that the boiler failures should be attributed to a technical oversight by Schneider—namely, Schneider's failure to install automatic surface or top blowdowns—and not the failure to conduct manual bottom blowdowns. (*Id.*). The United States also claims that a genuine issue of material fact remains as to whether insufficient routine maintenance, such as chemically treating the boiler feedwater or failure to conduct manual bottom blowdowns, should be perceived as the cause for the boiler failures (Def.'s Resp. at 38 (stating that USDA "claims feedwater [was] the same quality as at onset of project" and that USDA was "[n]ever told about blowdown need[,] which would require boiler tender time.")). Even if the United States disputes Schneider's argument that lack of routine preventative maintenance caused the boiler failures, that response fails to address the threshold legal question over which party was responsible for conducting such maintenance under the Contract. Analyzing the actual impact of failure to conduct such maintenance on boiler shutdowns is secondary to determining which party had that responsibility

14

in the first place. Accordingly, the Court first analyzes the text of the contract to determine parties' maintenance obligations.

The express terms of the Contract state that Schneider is only responsible for boiler maintenance tasks that are carried out on a "Quarterly or Annual" basis only. (Pl.'s Ex. 3 at 15). Neither party disputes that the two maintenance tasks at hand—chemical treatment of boiler feedwater and manual bottom blowdowns—must occur more frequently than on a quarterly or annual basis. (*See* Pl.'s Ex. 50 (McHugh Dep.) 119:6–10 (conducting blowdowns "is one of the time-consuming tasks. They do that twice a day . . . .")). Because the unambiguous terms of the contract only require Schneider to conduct quarterly or annual maintenance on the boilers, it follows that the contract viewed the more routine maintenance tasks, including chemical treatment of the feedwater and bottom blowdowns, as USDA responsibilities. The United States has not provided an alternative interpretation of the express language relied on by Schneider nor has it relied on alternative provisions in the contract that would render such language ambiguous. *See Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 n.2 (Fed. Cir. 2000) ("A contract provision or clause is ambiguous only if it is susceptible to two different and reasonable interpretations, each of which is found to be consistent with the contract language."). Therefore, Schneider is correct as a matter of law, that USDA was responsible for conducting regular maintenance of the boilers; consequently, USDA's failure to conduct such regular maintenance constitutes a breach of the contract.

However, a genuine issue of material facts remains as to the materiality of this breach. Determining the materiality of a breach always considers the totality of events and circumstances around performance, including the nature and effect of the breach and how the contract was viewed, bargained for, entered into, and performed. *Stone Forest*, 973 F.2d at 1552. Here, the United States continues to dispute that failure to chemically treat the boiler feedwater or conduct manual blowdowns caused the boiler failures. (Def.'s Resp. at 36–8). Instead, the United States maintains that Schneider's failure in installing automatic surface blowdowns at the onset of performance and/or Schneider's failure to properly train USDA about the need to conduct blowdowns is the main cause of the boiler failures. (*Id.* at 38). Although Schneider disagrees with the United States' contention that installing automatic blowdowns from the onset would have obviated the need for conducting manual blowdowns, it has not met its burden of showing that there are no "unexplained gaps" in the evidence: such as whether the contract did indeed require Schneider to install top blowdowns, and if so, whether installing automatic top blowdowns would have eliminated the need for conducting daily bottom blowdowns. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *see also Anderson*, 477 U.S. at 255 (finding that in determining whether factual disputes remain, the court must draw inferences in favor of the nonmoving party). Because Schneider bears the burden of proof, summary judgment cannot be granted unless Schneider makes a showing on each required element and unless the United States' response fails to raise a genuine issue of material fact as to every element. *Lencco Racing Co. v. Jolliffe*, 1999 U.S. App. LEXIS 14239 at *9–10 (Fed. Cir. 1999). The United States' factual disputes over the ultimate cause of the boiler failures as well as Schneider's own installation obligations under the contract produces genuine issues of material fact as to whether failure to conduct daily maintenance by USDA was a material breach. Therefore, the Court denies Schneider's motion for summary judgment as to Count II.

i.   Denial of Access to BAS

It is undisputed that by early 2019, USDA unilaterally canceled Schneider's remote access to BAS—USDA's automation system for controlling and monitoring the performance of the energy-saving systems. (Def.'s Resp. at 9). USDA states that it denied Schneider access because USDA "had concerned about its cybersecurity." (*Id.*). Subsequently, a hard drive failure, which the United States attributes to "an overload of failure notices related to the boiler failures," permanently disabled the BAS system. (Pl.'s Ex. 48 (USDA Quality Assurance Specialist, Christopher Mehelis's Dep.) 63:6–64:15). Schneider claims that its access to the BAS was "a critical requirement" to "inspect the ECMs and electronically report its findings to the USDA." (Pl.'s Mot at 23). Specifically, Schneider claims that the BAS allowed Schneider to "obtain information for measurement and verification purposes," determine energy savings, and "monitor and troubleshoot boilers issues." (*Id.*).

Schneider has not shown that denial of access to BAS was of vital importance or went to the essence of the contract so as to constitute a material breach. *Thomas v. Dep't of Hous. & Urban Dev.*, 124 F.3d 1439, 1442 (Fed. Cir. 1997). Although it is undisputed that BAS allowed Schneider to monitor systems performance and measure energy savings, Schneider has not established with enough particularity the exact link between lack of access to BAS and the specific boiler failure issues in this case. Schneider merely states that BAS was "one of the key pieces of equipment updates" under the contract and that it "allow[ed] Schneider to measure and verify energy savings under the ESPC, the underlying reason the parties entered into the ESPC." (Pl.'s Mot at 47). Yet, as previously noted, the United States did not terminate the contract because of a shortfall in energy-savings guarantees but instead for specific boiler operational failures. Schneider has not established how ongoing access to BAS would have allowed it to remedy the boiler failure issues listed referenced in the termination decision or detailed in the July Memo. (Pl.'s Ex. 41, 42). Without this link, the materiality of any perceived breach by the United States in denying access to BAS remains a question of fact to be resolved at trial. Furthermore, parties also maintain a factual disagreement over whether USDA took adequate steps to restore BAS access and whether the parties "reached a mutually-agreeable solution" to substitute on-site visits for BAS access. (Def.'s Resp. at 9). These factual disagreements foreclose a decision at the summary judgment stage on whether the United States breached any contractual duties to guarantee access to BAS or, if so, if such breach was excused or waived through Schneider's actions. *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002) (finding that at the summary judgment stage, the moving party has the burden to show that "there is an absence of evidence to support the non-moving party's case.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). Therefore, the Court denies Schneider's motion for summary judgment as to Count III.

### III.   Conclusion

The United States took the drastic decision of terminating Schneider for default after receiving 91.45% of the value of the contract. (Pl.'s Ex. 62). The United States' defense of its decision to unilaterally withhold progress payments at that stage and its underlying reasoning for termination is unpersuasive. Contract law keeps an attentive eye on the exercise of default

termination power, having recognized that the power causes "a drastic adjustment of the contractual relationship." *Clay Bernard Sys. Int'l, Ltd. v. United States*, 22 Cl. Ct. 804, 810 (1991). And so, the Court strongly adheres to the principle, also reflected in FAR, that the termination decision must be governed by the provisions of the contract. The United States' approach in unilaterally withholding payments bypassed the Measurement and Verification procedure of the Contract. The United States' default termination analysis also contorted the Contract's stated goals and performance metrics. Feeling aggrieved by aspects of Schneider's performance—rightly or wrongly—the United States' freewheeling stroll down the road to default termination involved turning away from the paths specifically laid out by the Contract's terms. The party that hastily diverts from the path provided by the contract's terms is bound to meet its destiny on the road it took to avoid it. In such cases, FAR's course correction involves converting an improper default termination to one for convenience.

The Court finds that the United States materially breached its payment obligations before terminating the Contract and that the CO's reasoning behind the termination decision did not align with the terms of the contract. Therefore, it is hereby **ORDERED** as follows:

(1) Schneider's motion for summary judgment as to Count I is **GRANTED**.

(2) Schneider's motion for partial summary judgment as to Count II is **DENIED**.

(3) Schneider's motion for partial summary judgment as to Count III is **DENIED**.

(4) Schneider's motion for partial summary judgment as to Count V is **GRANTED**.

Pursuant to discussions held with the parties during a status conference on January 10, 2023, the Court **ORDERS** the parties to meet and confer within the next five days regarding further proceedings. The Court will issue a separate order scheduling a status conference to discuss the schedule for the remainder of this case.

**IT IS SO ORDERED.**



s/     David A. Tapp____
DAVID A. TAPP, Judge